547 A.2d 488

Commonwealth of Pennsylvania, Department of Transportation, Bureau of Driver Licensing, Appellant *v.* Ronald Earl Fleming, Appellee.

Submitted on briefs March 22, 1988, to Judges DOYLE and McGINLEY, and Senior Judge KALISH, sitting as a panel of three.

*Christopher J. Clements,* Assistant Counsel, with him, *Harold H. Cramer,* Assistant Chief Counsel, and *John L. Heaton,* Chief Counsel, for appellant.

*Donald J. McCue, McCue & Watson,* for appellee.

OPINION BY JUDGE DOYLE, September 9, 1988:

The Department of Transportation, Bureau of Driver Licensing (DOT) appeals an order of the Court of Common Pleas of Fayette County reinstating the driving privileges of Ronald Earl Fleming (Appellee). DOT had suspended Appellee's driving privileges for a period of one year for his refusal to submit to a blood alcohol test in violation of Section 1547(b) of the Vehicle Code, 75 Pa. C. S. §1547(b). We affirm.

The trial court found that, on April 12, 1986, Appellee was arrested by Trooper William Phillips (Trooper Phillips) for driving under the influence of alcohol. After obtaining Appellee's consent to submit to a breath-

alyzer test, Trooper Phillips learned that the machine was out of service. As a result, Trooper Phillips transported Appellee to Uniontown Hospital and required him to submit to a blood alcohol test. The record shows that Appellee repeatedly stated his willingness to submit to a breathalyzer test, but he adamantly refused to submit to the blood test. Appellee testified that in the past he had received extensive skin grafts on both arms due to an industrial accident and he refused the blood alcohol test because he feared having the skin grafts punctured. Trooper Phillips warned Appellee that his refusal to submit to the blood alcohol test would result in an automatic suspension of his driving privileges.

The trial court found that Trooper Phillips' demand of Appellee to submit to the blood alcohol test was unreasonable in light of medical risks to Appellee from drawing blood and the existence of alternative methods of testing which posed no such risk. Accordingly, the trial court reinstated Appellee's driving privileges, and this appeal followed.

In the instant matter, there is no question that the Commonwealth has met its initial burden for sustaining a license suspension pursuant to Section 1547.[1] Where

---

[1] Under Section 1547(b) of the Code, the Commonwealth must establish that the driver involved: (1) was arrested for driving while under the influence of alcohol; (2) was requested to submit to a breathalyzer or blood alcohol test; (3) refused to submit to such a test; and (4) was specifically warned that a refusal would result in the revocation of his driver's license. *Wheatley v. Department of Transportation,* 104 Pa. Commonwealth Ct. 171, 521 A.2d 507 (1987). Trooper Phillips testified that he arrested Appellee upon finding him slumped over the wheel of his car which was stopped in the eastbound lane of traffic with the motor running. He further testified that he observed the odor of alcohol on Appellee's breath and a staggering gait when Appellee left his car. After arriving at the hospital, Trooper Phillips advised Appellee of the implied consent law and of the consequences of a refusal to submit to chemical testing.

the Commonwealth has proven its *prima facie* case for a license suspension, the burden then shifts to the driver to show by competent evidence that he or she was physically unable to take the test, or that he or she was not capable of making a knowing and conscious refusal. *Department of Transportation, Bureau of Traffic Safety v. Cassidy,* 103 Pa. Commonwealth Ct. 582, 521 A.2d 59 (1987). Further, questions of credibility and the resolution of testimonial conflicts are for the common pleas court. *Phillips v. Commonwealth,* 84 Pa. Commonwealth Ct. 217, 478 A.2d 958 (1984).

The trial court received conflicting testimony on the issue of whether or not Appellee notified, or attempted to notify, Trooper Phillips of his *obvious,* physical impairment upon his arrest. At the hearing, Trooper Phillips testified as follows:

Q. Trooper, did he give you any reason for refusing the blood test?

A. Not to my recollection.

Q. Did he indicate to you that he had been in an accident prior to this occasion, that his arms were burned and he could not submit to a blood test?

A. I don't recall that, no.

Q. Did Mr. Fleming appear to be injured?

A. No, ma'am.

Q. Did he ask to see a doctor?

A. No, ma'am.

N.T. 6.

On cross-examination, he further testified:

Q. Did he indicate to you why he wanted to take the breath test?

A. No, sir, I don't believe so.

Q. Did he indicate to you any reason why he was unable to take the blood test?

A. No, sir.

Q.   From looking at him could you observe that he had injuries to the skin from a prior accident?

A.   No, sir.

Q.   You didn't notice anything different or unusual about his skin tone, complexion, or color?

A.   No, sir.

Q.   Did he show you his arms or any other portion of his body during any part of your conversation?

A.   Not to my recollection, sir.

N.T. 8.

In contrast, Appellee testified that after his arrest he informed Trooper Phillips of his physical inability to take a blood test, and he asked to be given a breathalyzer test instead. His testimony is as follows:

Q.   At what point in the conversation did the matter of a breath test or a chemical test arise?

A.   I'm not sure of the specific time. I know that the matter of the blood test came up and I had told him prior to that that I would take a breathalyzer test.

Q.   When did you first tell the officer that you would take the breathalyzer test?

A.   At some point shortly after being put in the patrol car.

Q.   And what was the response of Officer Phillips, if you can recollect.

A.   That their equipment was not functioning properly, and I would have to take a blood test.

Q.   And what did you indicate with regard to the blood test?

A.   I told him that I would not have a blood test administered.

Q. And what reason did you indicate?

A. I had extensive skin grafts on my upper arm, on my upper body and upper arms.

Q. When did those extensive skin grafts take place?

A. In 1982.

Q. As a result of what?

A. An industrial accident.

Q. Did you show your upper arms to the officer?

A. I was never given an opportunity to show my upper arms to the officer, although my hands were visible.

Q. And would you hold your hands out and tell us what their appearance is?

A. Well, they're very rough and bumpy, and that's due to the skin grafts. (Witness holding hands out and displaying them.)

Q. Would you take your jacket off and show us your arms and describe those, please?

A. The skin grafts covered both arms, and some of them are healed over but a lot of the heavier grafts are showing. (Witness removes jacket and displays his arms.)

Q. Indicating skin grafts covering both right and left arms?

A. Yes.

Q. Evidence of scar tissue still present, roughness, redness, discoloration still present. Is that correct?

A. Yes.

N.T. 12-13.

The trial court, in determining credibility, resolved the issue as follows:

However, we find that *under the facts of this particular case,* the officer's demand that the de-

fendant submit to a blood alcohol test can be viewed as unreasonable. When the taking of a blood test risks complications to a person's unique situation, then the officer's demands can be viewed as unreasonable, particularly when there are alternative methods of testing which are available and the defendant is willing to submit to the other tests. In such a situation, the discretion of the officer must be tempered by the practical realities of the situation.

Moreover, because we concur with the trial court's finding that Appellee's presentation at the hearing of his obvious skin condition was legally sufficient to prove his incapacity to receive a blood test, we must reject the Department's assertion that Appellee's incapacity was unsupported by competent medical evidence. As this Court stated in *Department of Transportation, Bureau of Traffic Safety v. Day,* 93 Pa. Commonwealth Ct. 49, 52, 500 A.2d 214, 215 (1985):

The cases discussing medical evidence do not indicate that such evidence is a per se requirement. See Department of Transportation, Bureau of Traffic Safety v. Dauer, 52 Pa. Commonwealth Ct. 571, 416 A.2d 113 (1980). What they do indicate is that a motorist's bare assertion of physical incapacity, absent any supportive medical evidence, is insufficient to meet the required burden of proof. Waigand v. Commonwealth, 68 Pa. Commonwealth Ct. 541, 449 A.2d 862 (1982); Department of Transportation, Bureau of Traffic Safety v. Hanes, 49 Pa. Commonwealth Ct. 407, 411 A.2d 571 (1980). With regard to the motorist's physical condition, each case must be decided on its individual facts.

In the case at hand, the trial court heard the testimony of Appellee and Trooper Phillips and it found

Appellee's assertion that he attempted to show his medical condition to Trooper Phillips at the scene to be more credible. Further, the trial court had the opportunity to view Appellee's skin condition, and it concluded that this medical evidence was legally sufficient to satisfy Appellee's burden to show that he was incapable of receiving the blood test.

In light of the foregoing, although this Court might have determined the credibility issue differently, we will affirm the order of the trial court.

### ORDER

Now, September 9, 1988, the order of the Court of Common Pleas of Fayette County in the above-captioned matter is hereby affirmed.